# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 20, 2018        Decided July 2, 2019

No. 17-5252

SUNDAY IYOHA,
APPELLANT

v.

ARCHITECT OF THE CAPITOL,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00324)

———

*Leslie D. Alderman III* argued the cause and filed the briefs
for appellant.

*Johnny H. Walker*, Assistant U.S. Attorney, argued the
cause for appellee. With him on the brief were *Jessie K. Liu*,
U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S.
Attorney.

Before: GARLAND, *Chief Judge*, and ROGERS and
GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In 2012, the Congressional Office of Compliance determined that the Architect of the Capitol unlawfully transferred appellant Sunday Iyoha because of his national origin. Iyoha now claims that the same unlawful discrimination was at play when he was denied promotions in 2014 and 2015. The district court granted summary judgment for the Architect, but we reverse in part because a reasonable jury could agree with Iyoha on his discrimination claims. We affirm the grant of summary judgment against his retaliation claims.

I

Sunday Iyoha was born in Lagos, Nigeria. He grew up speaking Eshan, his parents' native language, but learned English in primary school and moved to the United States at age 29, in 1995. He has worked in the Architect's Information Technology Division (ITD) since 2008.

In 2011, Jay Wiegmann was hired as the Architect's Chief Information Officer (CIO). Shortly after taking over, Wiegmann stopped taking in-person briefings from Iyoha, and allegedly told his staff at a meeting that he was glad that Iyoha had decided to communicate with him using email because he could not understand Iyoha's foreign accent when he spoke. An employee testified that Wiegmann commented multiple times about communication problems purportedly caused by employees who "don't speak English as their first language," asking "what can you expect?" J.A. 344-45. When someone raised a concern about these comments, he replied "So sue me. We can't have people like that as our first-line communicators." *Id.* Wiegmann denies making these and other comments about people with foreign accents. Because this appeal arises from a grant of summary judgment for the

Architect, however, we ask only whether "viewing the evidence in the light most favorable to [Iyoha] and drawing all reasonable inferences accordingly," "no reasonable jury could find in [Iyoha's] favor." *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018). We therefore resolve "he said, she said" evidentiary disputes in favor of the non-movant, and assume for the purposes of this appeal "that [the employer] made those statements." *Id.* at 950.

In October 2012, Iyoha was reassigned out of a position in the Production Management Branch of the ITD to a position with the same pay and at the same level in a different branch. The move was part of a larger realignment in the division, and several other Architect employees and contract workers who spoke with foreign accents were removed from positions that involved dealing with customers.

Relying largely on Wiegmann's comments, Iyoha filed a complaint with the Office of Compliance alleging that he was reassigned because of bias against people with foreign accents. A hearing officer ruled in Iyoha's favor, finding that the reorganization "was [not] an established plan at all, other than to move those with foreign accents to less customer-facing positions," and concluded "that the circumstances of [Iyoha's] reassignment create an inference of discrimination." J.A. 315, 311. The hearing officer ordered the Architect to pay Iyoha $30,000 in damages. Wiegmann was not disciplined or reprimanded for his role in the discriminatory reassignment, and his comments about Iyoha's accent continued. In 2014, Wiegmann called Iyoha into his office to test his phone's voice recognition software and exclaimed, "Oh it understands [Iyoha's] accent," and later mentioned at a meeting with other staff that the software "even recognizes [Iyoha's] accent." J.A. 1099.

In April 2014, the Architect invited applications for the position of Branch Chief of the Production Management Branch, which had been vacant since the 2012 realignment, when an employee with a foreign accent was removed from the position. Iyoha and seventy-five other candidates applied. Angela Clark, the Deputy CIO, reviewed their resumes and selected ten, including Iyoha, for in-person interviews. Clark told Wiegmann at the time that she would not have selected Iyoha for an interview based on his resume, but did so because of an agency hiring policy that required her to interview all internal candidates when fewer than five apply, as was the case here.

Each interview was conducted by a panel of four people selected by Clark: herself, Wiegmann, and two members of other divisions that interacted regularly with the ITD, Peggy Hernandez and Luis Rosario. Each candidate was asked the same set of questions, and the panelists scored their responses. After some of the interviews, Hernandez and Rosario, who were not technical experts, asked Wiegmann and Clark whether a particular answer requiring technical knowledge was "strong" or not. J.A. 2137. Out of the ten candidates, Iyoha was scored ninth by Clark, seventh by Wiegmann, and fifth by Rosario and Hernandez. The highest scoring candidate was Teddy Tseng, who is from Taiwan and speaks English with an accent. Clark made the decision to offer Tseng the Branch Chief position in August, and he began work in October. Iyoha filed complaints with the Office of Compliance and later in the district court alleging he was not selected because of his national origin and as retaliation for his previous, substantiated, complaint of discrimination.

Meanwhile, Clark and others began having concerns about Tseng's management abilities, and after only ten months in the job Tseng opted to resign rather than be removed. The

5

Architect advertised for the Branch Chief position once more, and Iyoha applied again. This time, the interviews were conducted by a five-member panel that did not include Wiegmann. Two panelists scored the candidate ultimately selected for the job, Eugene Block, the highest, and the other three ranked candidate D.G. highest. Candidate A.M., who speaks with a foreign accent, was either the second or third choice of all five panelists.

Block, D.G., and A.M. were invited to a second interview, this time by a panel made up of Clark, Wiegmann, and Wiegmann's immediate supervisor, Doug Ferguson. D.G. was offered the position but declined. Block was then offered the position, and he accepted.

Iyoha's lawsuit concerning the Architect's 2014 decision not to promote Iyoha was then pending in district court, and in 2016 Iyoha filed a supplemental complaint alleging that the 2015 decision was also a result of discrimination and retaliation. After discovery, the district court granted the Architect's motion for summary judgment against all of Iyoha's claims. *Iyoha v. Architect of the Capitol*, 282 F. Supp. 3d 308, 335, 337 (D.D.C. 2017).

II

The district court exercised jurisdiction over this civil action under the Congressional Accountability Act (CAA), 2 U.S.C. § 1408. We have jurisdiction to review the district court's final judgment pursuant to 28 U.S.C. § 1291.

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We review the district court's grant of summary judgment for

the Architect de novo. *DeJesus v. WP Company LLC*, 841 F.3d 527, 531 (D.C. Cir. 2016). In so doing, we view the evidence in the light most favorable to Iyoha, draw all reasonable inferences in his favor, and may not "make credibility determinations or weigh the evidence." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).

Iyoha asserts discrimination and retaliation claims under the CAA, 2 U.S.C. §§ 1311 and 1317, rather than the more familiar provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, which does not by its own terms apply to the Architect, *id.* § 2000e(b)(1). But the CAA explicitly incorporates Title VII's prohibition of discrimination on the basis of national origin, so our analysis of Iyoha's claims is the same as if they were brought under Title VII. *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 15 n. 24 (D.C. Cir. 2006). The CAA does not incorporate Title VII's provisions barring retaliation, but instead has its own provision with similar language. *Compare* 2 U.S.C. § 1317 ("It shall be unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against" an employee who engages in protected activity.), *with* 42 U.S.C. § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate against" an employee who engages in protected activity.). Because neither side has argued that the CAA's protections against retaliation are substantively different from the protection afforded by Title VII, we assume our Title VII precedent applies to Iyoha's CAA retaliation claim. *Accord Fields*, 459 F.3d at 15 n. 24 (D.C. Cir. 2006); *see Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (arguments not made are generally forfeited).

We use the three-step framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate discrimination and retaliation claims that rely on indirect,

circumstantial evidence. The employee must first make out a prima facie case of retaliation or discrimination. *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016). The employer must then come forward with a legitimate reason for the challenged action. *Id.* If that burden is met, the district court must conduct one "central inquiry" in deciding an employer's motion for summary judgment: "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyami v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). On appeal from a grant of summary judgment, when the employer has already met its burden, we can skip ahead to the final step and focus on that "central inquiry." *Id.*; *see Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

## III

Here, the Architect has proffered a legitimate explanation for not selecting Iyoha as Branch Chief: "a panel of interviewers unanimously agreed that he was not the most qualified candidate." Architect Br. 18. To support this argument, the Architect relies extensively on the scores given to Iyoha during the interview process, claiming that the candidates with the highest scores were offered the position in both rounds of hiring. *Id.* at 22-23. The question thus becomes whether a reasonable jury could find in Iyoha's favor based on all the evidence, including "any evidence the plaintiff presents to attack the employer's proffered explanation for its actions" and "any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d

504, 508 (D.C. Cir. 2005) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002)).

We first explain why there is sufficient evidence for a reasonable jury to infer that the 2014 decision not to select Iyoha was motivated by bias. We then discuss the same question, and come to the same conclusion, with respect to the 2015 decision. Finally, we explain why Iyoha's retaliation claims cannot meet this standard.

A

Iyoha argues that summary judgment on his 2014 national origin discrimination claim was inappropriate because statements made by Clark and Wiegmann demonstrate that they harbor a bias against people with foreign accents. In Iyoha's view, their demonstrated bias creates a material dispute of fact as to whether the scores he received in the interview were motivated by a desire to discriminate, rather than a legitimate assessment of his qualifications.

Although the CAA and Title VII do not explicitly bar discrimination on the basis of foreign accent, a foreign accent and national origin are often intertwined, and courts can look to evidence of discrimination on the basis of one's accent in support of a claim of national origin discrimination. *In re Rodriguez*, 487 F.3d 1001, 1008-10 (6th Cir. 2007); *Fragrante v. City & Cnty. of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989); *cf. Hernandez v. New York*, 500 U.S. 352, 371 (1991) (observing that language or skin color can be a surrogate for race in certain contexts). We will treat evidence that the Architect discriminated against Iyoha on the basis of his foreign accent as evidence of discrimination on the basis of his national origin. *Accord In re Rodriguez*, 487 F.3d at 1009; *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1347-

48 (11th Cir. 2005) (holding that a supervisor's statement that the plaintiff had not been promoted because his fellow employees "are all white and they are not going to take orders from you, especially if you have an accent," constituted direct evidence of national origin discrimination). To be sure, if an employee's language skills interfere with their ability to do their job, that might be a legitimate basis for an employment action. *See Fragrante*, 888 F.2d at 596-97. Here, however, the Architect has not alleged in litigation, and Iyoha's supervisors never asserted in their depositions, that Iyoha's foreign accent made him hard to understand or interfered with his ability to perform employment-related tasks.

Iyoha first argues that the person making the final hiring decision, Angela Clark, was biased against him. He relies on statements made by Clark—that she would not have interviewed Iyoha if Architect policy did not require her to do so—and on Clark's participation in a discussion concerning communication problems within the division, during which Wiegmann made comments about the foreign origin of certain ITD employees. A witness testified that although she could not remember "exactly which person was talking," she recalls her "red flag went up" with respect to not only Wiegmann's statements but also Clark's. J.A. 2310. Further, the 2012 hearing officer found the testimony of *both* Clark as well as Wiegmann not credible with respect to the reasons for Iyoha's 2012 reassignment. Given this history, a reasonable jury could find Clark's comments revealed unlawful bias toward Iyoha.

Furthermore, even if Iyoha could not create a dispute of material fact with respect to Clark's bias, there was additional evidence of bias in the selection process. Although Clark had the final say in who would be hired in 2014, she was not solely responsible for the decision not to promote Iyoha. "[A]n employer's liability for the discriminatory acts of its agents

goes beyond the final decisionmaker" because "[t]he actions of a discriminatory supervisor that feed into and causally influence the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action." *Steele*, 899 F.3d at 950. And here, as the Architect concedes, Clark's decision not to promote Iyoha was based on the scores assigned to the candidates by a panel of interviewers, including Wiegmann. Architect Br. 11.

To show that Wiegmann was biased against individuals with foreign accents, Iyoha relies on Wiegmann's central role in the 2012 realignment, as well as the statements he allegedly made about Iyoha and people with foreign accents. The district court largely dismissed these comments, concluding that they "do not facially give rise to an inference of national origin discrimination," but rather suggest only that "Wiegmann . . . sought to address concerns regarding effective communication within the [division]." *Iyoha*, 282 F. Supp. 3d at 322. This was error: a district court is obligated to "view the record in the light most favorable to [the plaintiff]," *Morris*, 825 F.3d at 669, and the district court's gloss on Wiegmann's comments unduly favored the Architect. Although a jury might conclude that some of Wiegmann's comments were merely expressions of legitimate concern, that is not the only reasonable interpretation. For instance, it is difficult to see how Wiegmann's joke that his phone's voice recognition software "even recognizes [Iyoha's] accent," J.A. 1099, is connected to legitimate concerns about effective communications. A reasonable jury could find that these comments were evidence of bias against individuals with foreign accents in general, and Iyoha in particular. And with this in mind, the other comments purportedly intended to improve communications would be viewed in a different light. A district court errs in "reviewing each racially charged remark individually and finding it insufficient" rather than considering the statements "alongside

any additional statements—and all other evidence—to determine whether a plaintiff has met [his] burden." *Morris*, 825 F.3d at 670.

A similar problem arises with respect to the district court's analysis of the temporal proximity between the statements made by Wiegmann and the allegedly discriminatory selection decision. The district court concluded that there was no connection between Wiegmann's 2012 statements and the challenged 2014 decision because, "given this significant gap in time . . . , it cannot plausibly be said, without more, that these alleged comments are related to the plaintiff's non-selection[]." *Iyoha*, 282 F. Supp. 3d at 323. This conclusion fails to draw inferences in the light most favorable to Iyoha, as we must.

We have previously observed that while a remark removed in time from the challenged employment action "carries less weight than one made at the time of the [employment action], it is nonetheless probative evidence of a supervisor's discriminatory attitude, at least when it is targeted directly at the plaintiff or is one of a pattern of similar remarks." *Morris*, 825 F.3d at 670 (finding comments made two or three years prior to adverse employment action to be probative of intent). The probative value of previous discriminatory statements might also be bolstered by evidence that a supervisor has previously taken adverse employment actions as a result of discriminatory attitudes, or continued to make such statements after a complaint had been filed and a hearing officer found that the remarks were discriminatory.

That is the case here. Wiegmann's comments were both "targeted directly at the plaintiff" and part of a "pattern" of such remarks. That pattern continued for more than nine months after the Architect had already been ordered to pay damages as a result of Wiegmann's discriminatory conduct.

The most recent statement was made just a few months prior to the 2014 employment decision directly at issue here, when Wiegmann made comments regarding the ability of his phone's voice recognition software to understand Iyoha's accent. What's more, Wiegmann had shown during the 2012 reorganization that he was willing to take action to exclude people with foreign accents from the Production Management Branch. A reasonable juror could conclude that Wiegmann's comments and actions are evidence of a discriminatory attitude towards employees with foreign accents, and that a supervisor who was willing to remove Iyoha from the Branch in 2012 because of his accent would not want Iyoha leading that Branch in 2014 for the same forbidden reason.

In order to defeat a motion for summary judgment, however, Iyoha must show more than "general bias." *Id.* He must also produce evidence to show that the decision not to select him was "motivated by that bias." *Id.* Here, that showing is complicated by the fact that the individual who made the allegedly discriminatory comments (Wiegmann) was not the final decisionmaker (Clark). We addressed a similar situation in *Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504 (D.C. Cir. 2005). Before applying for a promotion, Salazar had been promised that a particular supervisor who had allegedly discriminated in the past would not play any part in the interview process. *Id.* at 506. When that supervisor acted behind the scenes to select an interview panelist and create the questions for the interview, we found that "a jury could infer something 'fishy' from the fact that [the supervisor] placed himself squarely at the center of a process designed to exclude him." *Id.* at 509. As a result, we reversed the district court's grant of summary judgment for the employer, finding there was reason to believe that the selection process was not "fairly administered." *Id.*

It is true, as the district court notes, that *Salazar* was a "close call," and that the case is somewhat distinguishable. Here, the Architect never promised that Wiegmann would not be involved in the selection process, so that promise could not be broken. But this difference cuts both ways: While there was no promise made to exclude Wiegmann, that he was actually on the interview panel means there was no need for him to act behind the scenes to affect the outcome. So while there is less evidence of subterfuge, his presence on the panel is strong evidence that the selection process was not "fairly administered." *Id.* A jury that found Wiegmann harbored a discriminatory bias against Iyoha could certainly conclude that Wiegmann's scores in the interview were artificially deflated on account of that bias. *Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001) ("[W]hen decision makers, or those who have input into the decision, express such discriminatory feelings around the relevant time in regard to the adverse employment action complained of, 'then it may be possible to infer that the decisionmakers were influenced by those feelings in making their decisions.'" (quoting *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000))).

The Architect urges us to follow *Porter v. Shah*, where we found that the "bare fact" that a selection official had previously been found by a jury to have retaliated against the plaintiff was "insufficient by itself to establish pretext." 606 F.3d 809, 816-17 (D.C. Cir. 2010). But Iyoha is not arguing that a jury should look at the "bare fact" of the hearing officer's *finding* that Wiegmann had discriminated against him in 2012. Instead, Iyoha is arguing that the *evidence* of discrimination in the 2012 reorganization is *also* evidence that can be considered by the jury in considering whether Wiegmann continued to discriminate against him in 2014.

The Architect challenges this conclusion, pointing out that the relatively low scores Iyoha received from Wiegmann were largely "in line with those of other panelists." Architect Br. 37. To begin, Iyoha testified that Peggy Hernandez, who sat on both the 2014 and 2015 interview panels, had complained about Iyoha's accent, told him she needed an interpreter to understand him, and asked him why he does not "pronounce words properly." J.A. 1107. Even leaving that aside, Wiegmann's presence on the panel makes it difficult to rely on the other panelists' scores because his "role in the process went beyond the specific scores he gave [Iyoha]." *See Salazar*, 401 F.3d at 510. Wiegmann was the most senior member of the panel, which may have given him more sway in their group discussions. Furthermore, Clark knew that Wiegmann had transferred Iyoha out of the Branch in 2012, that a hearing officer had found that the transfer was improper, and that Wiegmann was never disciplined or counseled as a result of his actions. So even if Clark did not hold discriminatory attitudes herself, a reasonable jury might conclude that Clark understood that Wiegmann did not want Iyoha employed in the Branch and scored him accordingly. *Cf. Steele*, 899 F.3d at 951 (holding that discriminatory comments made by a supervisor who was not the final decisionmaker were relevant when that supervisor had made such comments in the "discussions" and "meeting" that resulted in an adverse employment action). Moreover, even if the other two panelists were unaware of Wiegmann's history with Iyoha and the Production Management Branch, a jury could conclude that Wiegmann's influence on the panel extended to them as well, because they relied on Wiegmann for his possibly biased view about whether candidates' answers to technical questions were "strong" or not. J.A. 2137. If Wiegmann's bias led him to falsely suggest Iyoha's technical answers were weak, that could have impacted the scoring of the other panelists.

Ultimately, *Salazar* stands for the proposition that when an employer seeks to rely on a "fairly administered" process to justify an employment action, the process must in fact be fair. A selection process that relies on numerical scores given by a panel of interviewers is only as fair as the panelists who give the scores. Here, a jury could find that the senior member of the panel not only had a history of making jokes about Iyoha's foreign accent but had actually discriminated against him in the past by removing him from the same Branch in which he was seeking a new position, and was in a position to potentially influence the scores given by the other members of the panel. Under those circumstances, a reasonable jury could find that the Architect failed to provide a "'fairly administered selection process,' and that its claim to the contrary is pretextual." *Salazar*, 401 F.3d at 509.

The Architect offers one final argument, that the hiring of Teddy Tseng demonstrates the interview process was not biased against those with foreign accents because he also speaks with one. But the decision to hire Tseng does not rebut the evidence of Wiegmann's bias against Iyoha. Even were all "people with foreign accents" in the same protected class, there is no testimony comparing Iyoha and Tseng's accents. Although "a replacement within the same protected class cuts strongly against any inference of discrimination," *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005), "[i]t is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of [a protected characteristic] merely because he favorably treats other members of the employees' group," *Connecticut v. Teal*, 457 U.S. 440, 454-55 (1982). Although some of Wiegmann's comments concerned accents in general, others targeted Iyoha specifically, as did the 2012 reorganization. So while the hiring of Tseng might be probative in determining whether Wiegmann had a bias against *everyone* with a foreign accent,

it does not displace the more specific evidence that Wiegmann had a bias against Iyoha based on *his* accent and foreign origin.

B

Next, we turn to Iyoha's claim that the decision not to promote him in 2015 was motivated by discriminatory animus. Clark was the selection official again in 2015, but the interview process was different in two important respects. First, the initial interview panel did not include Wiegmann. This removes the key reason we found that summary judgment was inappropriate for Iyoha's 2014 national origin discrimination claim.

Nonetheless, we find that the district court erred in granting summary judgment for the Architect. As an initial matter, the 2015 panel retained Hernandez, who allegedly had a history of making comments about Iyoha's accent. But more importantly, in *Salazar*, we held that unexplained deviations from established procedure can permit a jury to infer that a purportedly fair selection process was in fact a pretext for discrimination. 401 F.3d at 508-09. And here, Clark elected to make a second important change to the 2015 process from that used in the 2014 selection, holding two rounds of interviews instead of one. Standing alone, this procedural change would not permit a jury to infer that anything was "fishy": the Architect had made no promises about the form of the selection process, and there is no evidence that the two-round interview violated any written guidelines or procedures. Iyoha argues, however, that Clark added the second interview midway through the process in order to ensure that a candidate with a foreign accent was not selected. Unlike in 2014, where there was a consensus choice after only one round of interviews, the panelists in 2015 had different top choices. Three panelists scored candidate D.G. the highest, while Clark and Hernandez

scored the eventual selectee Eugene Block the highest. Candidate A.M., who speaks with a foreign accent, was the second or third choice of all five panelists. And while A.M. scored lower than D.G., Clark was aware from a review of D.G.'s resume that the job would have constituted a demotion from his current position in another agency, and thus a reasonable jury might conclude that Clark suspected that D.G. was unlikely to take the position even if offered. Indeed, when D.G. was ultimately offered the job, he never responded. This raises the possibility, as Iyoha argues, that Clark added the second round of interviews once it became apparent that A.M., a candidate with a foreign accent, might have the highest score.

The Architect counters that the decision to hold a second round of interviews had nothing to do with the possibility that A.M. might get the job. According to Clark, she decided at the outset of the 2015 selection process that the first round of interviews would only identify the top three scoring candidates, and she had always intended to hold a second round of interviews. Clark testified that this was explained to the other panelists "[i]n the very beginning before the interview process started." J.A. 191. But this is inconsistent with the testimony of another first-round panelist, who reported that he was not told about the second round until after the first round of interviews was complete. J.A. 2271 ("I believe it was after all the candidates were interviewed . . . Angela Clark told us, told the whole panel . . . that there would have to be a second interview."). A jury that credited this testimony over Clark's could determine that Clark was trying to conceal the timing of the decision to hold a second round of interviews—and consequently, was trying to conceal the reason behind the second round of interviews as well. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (observing that factfinders may construe dishonesty as "affirmative evidence of guilt").

The potential inconsistency is made more salient by the context in which Clark made the decision to hold another round of interviews. *See Evans v. Sebelius*, 716 F.3d 617, 622 (D.C. Cir. 2013) (finding that an argument about "shifting and inaccurate explanations becomes more salient" when accompanied by evidence of previous discriminatory comments). Clark had acted in tandem with Wiegmann in the reorganization that removed Iyoha and others with foreign accents from the Production Management Branch and participated in the allegedly discriminatory discussion concerning communication problems within the division. By 2015 she knew that her immediate supervisor had both made discriminatory comments about Iyoha's accent and had previously scored Iyoha extremely low in an interview to be the head of that Branch. What's more, she was aware that despite a monetary award that resulted from Wiegmann's previous actions against Iyoha, he had never been disciplined or censured by the Architect. Under those circumstances, a reasonable jury could conclude that Clark understood that Wiegmann did not want Iyoha or others with a foreign accent in the position, and acted accordingly.

To be sure, the addition of a second-round interview did not affect Iyoha directly, as he scored low enough on the first round that he was likely eliminated from consideration regardless of whether there was a second round of interviews. However, the change in procedure and the possibility that it was intended to prevent a candidate who spoke with a foreign accent from being offered the position raises a dispute of material fact as to whether the interview process as a whole was free from national origin bias.

This conclusion is strengthened even further in light of the adverse inference arising from the Architect's failure to

produce a "justification memo," written by Clark, explaining the reasons behind the decision to hire Block for the Branch Chief position in 2015. Iyoha Br. 41. After selecting who to hire, Architect policy required that Clark debrief internal candidates. In 2014, as part of that debriefing process, Clark created a hand-written "justification memorandum" that explained the selection decision in general terms. *See* J.A. 2794 ("Two top requirements for this position were management experience and an extensive technical background . . . . Based on these requirements, the panel determined that the candidate selected was the strongest in these key areas."). Clark testified that she created a similar memorandum in 2015, and said that those notes were turned over to counsel for the Architect. J.A. 984. This memorandum, however, was not produced to Iyoha in discovery.

The "adverse inference" doctrine allows a court to draw a "negative evidentiary inference" from the spoliation of records. *Talavera v. Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011). The district court rejected Iyoha's request for such an inference, concluding that "it would be entirely unreasonable for those notes to indicate that the panel should avoid candidates who spoke with accents, given that the record reflects that one of the top three candidates selected for a second interview spoke with an accent." *Iyoha*, 282 F. Supp. 3d at 334. This was error. Given Iyoha's claim that the selection process was pretextual and infused with discrimination against people with accents, Clark's memo explaining the panelists' decision is clearly relevant, and the district court erred by refusing to draw an adverse inference on the grounds that "it does not find these documents relevant to the plaintiff's showing of pretext." *Id.*

On appeal, the Architect argues, incorrectly, that "[n]othing in the record indicates that any such memorandum ever existed," and maintains that Iyoha has failed to show "that

there is any document-retention policy that Ms. Clark violated." Architect Br. 46. As discussed above, the existence of the 2014 justification memorandum, and Clark's testimony confirming that she created a similar memorandum in 2015, is more than sufficient to establish that a memorandum existed at some point in time. As for the Architect's document-retention policy, Iyoha argues that the Architect's Human Resource Manual requires preservation of selection documents for two years, a contention the Architect does not dispute.

In any event, we have held that a negative spoliation inference is warranted in the context of a duty to preserve that arises out of foreseeable litigation. *Gerlich v. DOJ*, 711 F.3d 161, 170-71 (D.C. Cir. 2013). Here, when the memo was created in 2015, litigation was "reasonably foreseeable," *id.* at 171, as Iyoha had filed his initial complaint in the district court more than six months before the 2015 position had even been posted. Given a clear duty to preserve the 2015 justification memorandum and the Architect's lack of explanation for its loss, a jury could draw an adverse inference on this basis. Even if that inference was not the specific one that Iyoha proposed—namely, that the memo contained "some mention of avoiding candidates who spoke with accents," *Iyoha*, 282 F. Supp. 3d at 334—"a permissive inference bounded by constraints of reason is appropriate—*i.e.*, the factfinder may draw reasonable inferences in favor of" Iyoha that the "notes contained information that might be favorable to [Iyoha]." *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 28 (D.C. Cir. 2013); *see Talavera*, 638 F.3d at 311-12.

Given our "obligation to draw reasonable inferences in [Iyoha's] favor," *Salazar*, 401 F.3d at 509, and the record evidence that (1) the Architect had previously discriminated against Iyoha on the basis of his foreign accent, (2) Clark may have changed the interview process in a way that

disadvantaged a candidate with a foreign accent, (3) Clark potentially lied about when and why the decision to make that change occurred, and (4) the Architect cannot produce the memorandum justifying the decision to hire another candidate, a reasonable jury could find that the Architect's reliance on scores Iyoha received during a "fairly administered selection process" is nothing more than a pretext for discrimination. As a result, summary judgment on Iyoha's 2015 national origin discrimination claim was inappropriate.

C

Finally, we address Iyoha's claims that he was passed over in 2014 in retaliation for having filed a discrimination complaint against the Architect in 2012, and that he was passed over again in 2015 in retaliation for having filed this lawsuit.

Claims of retaliation under Title VII are governed by the same *McDonnell-Douglas* burden-shifting analysis applicable to discrimination claims. *Carney v. American Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998). Under this framework, Iyoha bears the initial burden of establishing a prima facie case for retaliation, which he can meet by showing "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). A plaintiff can establish the "causation" element of the prima facie case by showing a tight temporal proximity between protected activity and an adverse employment action. However, "only where the two events are 'very close' in time" does temporal proximity support an inference of causation. *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Iyoha offers, at best, weak evidence of temporal proximity. But we need not resolve these timing issues. Even if we assume that Iyoha could make out a prima facie case for retaliation based on temporal proximity, his claim cannot survive summary judgment. Once the employer proffers a non-retaliatory explanation for the adverse employment action, we must determine whether Iyoha has "put forward enough evidence to defeat the proffer and support a finding of retaliation." *Id.* at 530. Mere temporal proximity is not sufficient to support such a finding, because otherwise "protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." *Id.* As a result, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations [for the adverse employment action] are genuine." *Id.*

Iyoha has not introduced anything beyond his weak evidence of temporal proximity to show that the Architect's decisions were motivated by a desire to retaliate against him. He first cites an October 2012 email by a supervisor who notes that Iyoha had filed a workplace harassment complaint. The supervisor played no role in the 2014 or 2015 hiring processes and the email does not relate to either. Moreover, merely noting that an employee has engaged in protected activity does not, without more, raise an inference of retaliation. Nor can he show retaliatory animus based on ambiguous statements made by Clark, statements with nothing on their face to connect them to Iyoha's previous complaints or an intent to retaliate.

Thus, even if we were to adopt Iyoha's interpretation of the relevant dates and find that he has established a prima facie case for retaliation using evidence of temporal proximity, there would still be insufficient evidence to defeat summary

23

judgment. We therefore affirm the district court's ruling granting the Architect's motion for summary judgment with respect to Iyoha's retaliation claims.

IV

We reverse the district court's grant of summary judgment with respect to Iyoha's discrimination claims, and affirm the district court's grant of summary judgment with respect to his retaliation claims.

*So ordered.*