# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 4, 2021         Decided October 15, 2021

No. 20-5295

JODI BREITERMAN,
APPELLANT

v.

UNITED STATES CAPITOL POLICE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00893)

*Anita Mazumdar Chambers* argued the cause for appellant. With her on the briefs were *R. Scott Oswald* and *John T. Harrington*.

*Kelly M. Scindian* argued the cause and filed the brief for appellee.

Before: WILKINS and RAO, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Jodi Breiterman challenges three disciplinary actions imposed by her employer, the United

States Capitol Police. She was suspended after commenting to fellow employees that women had to "sleep with someone" to get ahead. She was later placed on administrative leave and ultimately demoted for leaking a picture of an unattended Capitol Police firearm to the press. Although Breiterman admits to this misconduct, she sued the Capitol Police, alleging sex discrimination and retaliation in violation of the Congressional Accountability Act, as well as unlawful retaliation for speech protected by the First Amendment. The district court granted the Capitol Police's motion for summary judgment. We affirm.

## I.

Congress established the Capitol Police to ensure the safety and security of the Capitol's facilities and to allow Congress to "fulfill its constitutional and legislative responsibilities in a safe, secure, and open environment." Breiterman served in the Capitol Police as a private first class for about eight years before being promoted to sergeant. As a sergeant, Breiterman's supervisory responsibilities included overseeing, evaluating, and disciplining officers; communicating information up the chain of command; and interacting with reporters to provide scheduling information.

Although Breiterman competently fulfilled these responsibilities and received praise for her dependability, she had been disciplined on several occasions before the events giving rise to this lawsuit. Breiterman also had previously raised a claim of race discrimination when she was denied reassignment to the Intelligence Section. Breiterman, a white woman, claimed she was discriminated against when an African-American supervisor filled the position with an African-American woman. Breiterman ultimately decided not to pursue the claim beyond mediation.

Breiterman's lawsuit challenges the discipline arising from two later events. The first occurred in 2014, when, in a conversation with subordinate officers and administrative staff, Breiterman speculated that a female officer was transferred to a favorable posting because of her "romantic relationship with a Deputy Chief." Breiterman added something like, "[y]ou have to sleep with someone to get ahead in the department." The officer learned of Breiterman's remarks and lodged a complaint with the Capitol Police's Office of Professional Responsibility ("OPR"). Sergeant Mark Shutters investigated the complaint, and Breiterman admitted making the negative remarks. OPR concluded Breiterman violated the Capitol Police's Rule of Conduct against "improper remarks" because she made "malicious, harassing, untruthful, or frivolous remarks or rumors against, or about, other members of the Department or individuals in the workplace."

OPR's report was sent to the Disciplinary Review Office, which recommends discipline for misconduct after considering the nature and seriousness of the offense, the officer's employment history, mitigating factors, and penalties issued in cases involving similar circumstances. The Office recommended a two-day suspension without pay, which Breiterman's bureau commander approved, specifically citing her supervisory role as a reason for doing so. Breiterman's discipline was sustained on appeal by the Deputy Chief and Chief.

The second disciplinary event occurred shortly thereafter. On January 29, 2015, a radio call reported an unsecured firearm in a men's bathroom in a restricted area of the Capitol Visitor Center. Breiterman and other members of the Capitol Police responded and secured the firearm. Breiterman photographed the firearm on her work phone and sent the pictures to her supervising officer. She also concluded—based on the

firearm's markings—that it was issued by the Capitol Police. The officer who left the firearm unattended was suspended for six days without pay.

About three months later, *Roll Call* reporter Hannah Hess published an article, "Capitol Police Left Guns in Bathrooms." The photo Breiterman had taken was printed directly beneath the headline. The article scrutinized the January 29 incident and two other incidents involving unattended Capitol Police firearms in the Capitol. Later that day, *Roll Call* published a follow-up article, "Do Capitol Police Problems Go Beyond the Bathroom?", which also featured Breiterman's photo. The articles generated a "media frenzy."

The Capitol Police's media policy prohibits "sworn employees" from "speak[ing] publicly or releas[ing] any information related to employee cases or administrative cases, [or] investigations." As part of an OPR investigation, Sergeant Shutters discovered that the photo printed in the news articles was Breiterman's and that she sent it to her personal email account several days before the first *Roll Call* article was published. Sergeant Shutters concluded Breiterman had probably leaked the photo.

During her interviews, Breiterman ultimately admitted sending the photo to Hess and telling her about the January 29 incident. According to the Capitol Police, Breiterman told Sergeant Shutters that she "did not know why" she sent the photo to Hess and admitted that doing so violated policy and exceeded her authority. Several months later, Breiterman sent a letter to the Inspector General of the Capitol Police, claiming she had spoken about "a matter of public concern," namely that a loaded firearm had been left unattended in a bathroom by a Capitol Police officer. She claimed to be concerned about the "repeated instances" of unattended firearms in the Capitol.

Breiterman admits, however, that until she spoke with Hess, she was unaware of other incidents involving unattended firearms. Breiterman was placed on paid administrative leave during the investigation.

OPR charged Breiterman for "conduct unbecoming." Based on Breiterman's supervisory status, disciplinary history, and the disruption resulting from her leak to the media, the Disciplinary Review Office recommended demoting Breiterman from her supervisory rank of sergeant to the non-supervisory rank of private first class. Although Breiterman's bureau commander disagreed with the discipline, the Assistant Chief thought demotion was appropriate because Breiterman leaked information about a pending investigation, which may have undermined the trust of her subordinates. The Assistant Chief also noted that Breiterman failed to provide a "legitimate … explanation" for her actions. After an unsuccessful administrative appeal, Breiterman was demoted.

Breiterman sued the Capitol Police in federal district court. She alleged her two-day suspension for "improper remarks" was in fact sex discrimination and retaliation in violation of the Congressional Accountability Act ("CAA"), Pub. L. No. 104-1, 109 Stat. 3 (1995) (codified as amended at 2 U.S.C. § 1301 *et seq.*). Additionally, she alleged her paid administrative leave and eventual demotion in the wake of the media leak were due to sex discrimination and retaliation in violation of the CAA as well as retaliation for speech protected by the First Amendment. The district court granted the Capitol Police's motion for summary judgment. Breiterman timely appealed.

## II.

This court reviews de novo the district court's grant of summary judgment. *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006). "The court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in her favor." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).

Breiterman first alleges discrimination and retaliation in violation of the CAA, which extends the protections of Title VII of the Civil Rights Act of 1964 to covered employees of the federal legislative branch, including members of the Capitol Police. 2 U.S.C. §§ 1301(a)(3)(D), 1302(a)(2); *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 701 (D.C. Cir. 2009). The CAA mandates that "[a]ll personnel actions affecting covered employees shall be made free from any discrimination based on … race, color, religion, sex, or national origin." 2 U.S.C. § 1311(a). Like Title VII, the CAA forbids an employer from retaliating against an employee because of protected activity. 2 U.S.C. § 1317(a); *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). In previous cases, we have generally assumed that Title VII precedent applies to retaliation claims under the CAA, and we use the burden-shifting framework in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), "to evaluate discrimination and retaliation claims that rely on indirect, circumstantial evidence." *Iyoha*, 927 F.3d at 566.

To advance a discrimination claim, the plaintiff must first establish a prima facie case of discrimination. *Wheeler*, 812 F.3d at 1113. If she carries that initial burden, the employer must then "articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 1114. If the employer articulates such a reason, the burden shifts back to the plaintiff to show the

employer's reason was a pretext for unlawful discrimination. *Id.* This framework applies in the retaliation context as well. *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014). And in both contexts, if the employer has offered a nondiscriminatory reason for its action, the court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.").

In this case, the Capitol Police provided legitimate, nondiscriminatory reasons for suspending Breiterman, placing her on administrative leave during an investigation into the media leak, and demoting her from a supervisory position. Therefore, "we skip ahead" and focus on whether Breiterman has sufficiently demonstrated pretext. *Wheeler*, 812 F.3d at 1114.

Even viewing the evidence in the light most favorable to Breiterman, she fails to demonstrate a genuine dispute of material fact regarding whether the Capitol Police's asserted reasons were pretextual, and so her discrimination and retaliation claims under the CAA fail.

## A.

Breiterman first asserts that her two-day suspension was based on sex discrimination. The Capitol Police maintains that it suspended Breiterman because she violated the rule against "improper remarks" in the presence of other employees when she suggested that a female officer received a favorable transfer only because of her romantic relationship with a deputy chief,

and that women must sleep with someone in the Capitol Police to advance their careers. Breiterman generally admits making these remarks but claims that the severity of the discipline was a result of sex discrimination. Breiterman, however, has failed to offer any evidence that would support an inference that the Capitol Police's reason for the two-day suspension—namely that Breiterman violated the rule against "improper remarks"— was a pretext for sex discrimination.

Breiterman also asserts that her two-day suspension was in retaliation for her equal employment opportunity ("EEO") complaint alleging racial discrimination when she was not selected for a position in the Intelligence Section. Because the Capitol Police has offered a legitimate non-retaliatory reason for the suspension, the "only question is the ultimate factual issue in the case—retaliation *vel non*." *Solomon*, 763 F.3d at 14 (cleaned up). To establish pretext, Breiterman must show "evidence discrediting" the Capitol Police's asserted reasons. *See id.* at 15; *see also Aikens*, 460 U.S. at 716 ("The plaintiff retains the burden of persuasion" and "may succeed … indirectly by showing that the employer's proffered explanation is unworthy of credence." (cleaned up)). This at least requires showing "circumstantial evidence that could reasonably support an inference" that those who recommended or imposed the two-day suspension "had knowledge of [her] protected activity." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (cleaned up). Breiterman provides no such evidence. She points only to Sergeant Shutters' knowledge of her EEO complaint, but Shutters was not involved in the recommendation or imposition of the two-day suspension. Breiterman's evidence is insufficient to show that her two-day suspension was retaliatory.

Because nothing in the record would allow a reasonable jury to conclude that the Capitol Police's reasons were a pretext

for discrimination or retaliation in violation of the CAA, we affirm summary judgment for the Capitol Police on claims related to Breiterman's two-day suspension.

B.

Breiterman next claims the Capitol Police discriminated against her on the basis of sex in violation of the CAA by placing her on paid administrative leave and demoting her. Breiterman admits she leaked the firearm photo to the media, but argues that the Capitol Police treated "similarly situated male employees … more favorabl[y] than her for comparable conduct," and that procedural irregularities throughout her case evince discriminatory intent. Breiterman also argues the Capitol Police imposed this discipline in retaliation for her protected EEO complaint in violation of the CAA. The Capitol Police maintains it placed Breiterman on paid administrative leave during the investigation consistent with Capitol Police policy and demoted her for leaking information to the press in violation of the Capitol Police's media policy. Breiterman fails to provide facts that demonstrate these legitimate reasons were a pretext for unlawful discrimination or retaliation.

As to her discrimination claim, Breiterman points to several putative comparators—male employees who allegedly committed similar or more serious violations but whom the Capitol Police disciplined less severely. Evidence of an employer's more favorable treatment to similarly situated employees without the plaintiff's protected characteristic may indicate discriminatory animus. *Wheeler*, 812 F.3d at 1115. "To prove that [s]he is similarly situated to another employee, a plaintiff must demonstrate that [she] and the allegedly similarly situated employee were charged with offenses of comparable seriousness," and "that all of the relevant aspects of [her] employment situation were nearly identical to those of

the other employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (cleaned up). When determining whether an employee is an appropriate comparator, this court considers factors such as: "the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.*

None of Breiterman's purported comparators are similarly situated. Most are non-supervisory officers with different ranks, titles, and job duties from Breiterman. *Compare Holbrook v. Reno*, 196 F.3d 255, 261–62 (D.C. Cir. 1999) (difference in seniority or supervisory status renders employees not similarly situated), *with Wheeler*, 812 F.3d at 1116 (employees working in similar units with the same seniority were similarly situated). As the Capitol Police explains, supervisors are entrusted with greater authority than officers, held to a higher standard, and disciplined more severely than officers for similar violations. Thus, Breiterman's non-supervisory comparators are too dissimilar to draw any inference of discriminatory treatment.

Even the three supervisory officials Breiterman cites are not appropriate comparators because they did not have similar disciplinary histories to Breiterman at the time of their infractions. *See Burley*, 801 F.3d at 301. Two of these officers had little or no prior disciplinary history, while the third had only three minor violations, two of which resulted in warnings. In contrast, Breiterman had been disciplined for four violations, two of which were serious and resulted in suspensions. These

supervisory officials are thus not similarly situated to Breiterman.

Breiterman also seeks to use as comparators the male inspector and captain who participated with Breiterman in (unrelated) inappropriate text messages. The texts were factored into Breiterman's punishment for the media leak, but the men were not punished. We agree with the district court that the Capitol Police's decision to not punish these men is "troubling," but neither the captain nor the inspector committed additional violations of "comparable seriousness." *See Wheeler*, 812 F.3d at 1115–16. Breiterman leaked a sensitive photo and information to the media, and the inappropriate texts were considered along with her more serious infractions. Ultimately, Breiterman's comparators are not similarly situated and therefore fail to indicate unlawful discrimination.

Breiterman also cites alleged procedural irregularities to prove pretext. An employer's "unexplained deviations from established procedure" may provide evidence that its proffered nondiscriminatory reason for an adverse employment action is pretextual. *Iyoha*, 927 F.3d at 571. But "[s]howing pretext … requires more than simply criticizing the employer's decisionmaking process"; "we may not second-guess an employer's … decision absent demonstrably discriminatory motive." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (cleaned up). Minor procedural irregularities without discriminatory intent are not enough to demonstrate pretext.

The alleged procedural irregularities Breiterman raises— the length of the investigation and being placed on administrative leave—do not suggest the Capitol Police's reason for demoting her was pretext for unlawful discrimination. Although demotions may be rare, Breiterman

does not argue that the Capitol Police deviated from the ordinary process for discipline resulting in a demotion. At bottom, Breiterman disagrees with the Capitol Police's decision to demote her. Without a showing of discriminatory animus, we have no grounds for second guessing the Capitol Police's disciplinary decision. *Id.*

Even assuming some procedural deviation occurred, the deviations are not so irregular as to indicate unlawful discrimination. The investigation spanned about ten and a half months, during which time Breiterman was on paid administrative leave. Breiterman does not dispute it is standard procedure for the Capitol Police to place an employee on paid administrative leave until the conclusion of a disciplinary process that may result in termination or demotion. In fact, records indicate that several male officers were placed on paid administrative leave for ten months or more. While Breiterman asserts that such practice is "highly unusual," she has not put forward facts to show that her leave was improper or unjustified. And while Capitol Police regulations require investigations like this one to be completed within 120 days, Breiterman's investigation lasted 133 days, which is a minor irregularity that does not suggest discriminatory intent.

Breiterman also claims she was demoted in retaliation for her previous EEO complaint in violation of the CAA. This claim lacks merit for the same reason as Breiterman's other CAA retaliation claim. Her only evidence of retaliatory intent is that Sergeant Shutters was aware of her prior EEO complaint. But as discussed above, Breiterman offers no evidence that the supervisors who placed her on leave and

demoted her knew of her EEO complaint. *See Jones*, 557 F.3d at 679.

We affirm the district court's grant of summary judgment to the Capitol Police on Breiterman's claims that her administrative leave and demotion were a result of sex discrimination and retaliation.

III.

Breiterman also asserts the Capitol Police demoted her in retaliation for exercising her First Amendment right to freedom of speech and the district court erred in concluding that the government's interests outweighed her interest in disclosing information about the unattended firearm at the Capitol.

The First Amendment safeguards an individual's freedom of speech. U.S. CONST. amend. I. Employees of the federal government, however, may "by necessity" have to "accept certain limitations on [this] freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Without "a significant degree of control over [an employee's] words and actions," the government would have "little chance for the efficient provision of public services." *Id.* Government employment does not extinguish free speech rights. "The speech of public employees enjoys considerable, but not unlimited, First Amendment protection." *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007).

A public employee claiming retaliation for exercising her First Amendment rights must show: (1) she "spoke[] as a citizen on a matter of public concern"; (2) her interest in commenting on matters of public concern outweigh the government's "interest in promoting the efficiency of the public services it performs through its employees"; (3) "her speech was a substantial or motivating factor in prompting the retaliatory or punitive act"; and (4) she can "refute the

government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech." *Id.* (cleaned up). We assume without deciding that Breiterman's leak to *Roll Call* was a matter of public concern and that she spoke as a citizen, rather than in her official capacity. Breiterman's claim, however, fails on the second prong.

When balancing the interests of the government against the speech interests of its employees, we consider "the manner, time, and place of the employee's expression" and "the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The strength of the government's interest turns on factors such as whether the employee's speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (citation omitted). Because of "the special degree of trust and discipline required in a police force," we have concluded that "there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees." *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998).

We also consider the public's interest in obtaining information. When a government employee is a "member[] of a community most likely to have informed and definite opinions" about an issue, the public has an interest in not being "deprived of informed opinions." *Garcetti*, 547 U.S. at 419–20 (cleaned up). Hence, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.* at 420 (cleaned up). And when a police officer is "uniquely qualified" to

address an issue of public concern, "we must be cautious in accepting the claim that the public interest demands that [s]he be silent." *O'Donnell*, 148 F.3d at 1135.

The Capitol Police had substantial interests in disciplining Breiterman for her unauthorized leak to the media. The Capitol Police maintains policies regarding confidentiality and the media to protect sensitive information in furtherance of the agency's mission. The Capitol Police also has a strong interest in employing officers and supervisors who can keep confidences, especially with respect to internal investigations and security. *See id.* Disciplining leaks—especially those that undermine trust and interfere with administrative and security functions—amply align with these interests.

Breiterman's conduct compromised the government's interests in efficiency, harmony, and security. The leak interfered with the Capitol Police's regular operations because for months it had to redirect resources to deal with the fallout from the *Roll Call* articles. There was a "danger that [Breiterman] had discredited [the Capitol Police] by making her statement," *see Rankin*, 483 U.S. at 389, thus undermining the particular trust required in a police force. As a supervisor, Breiterman had greater responsibility to uphold the mission and policies of the Capitol Police, and her breach undermined her ability to continue in a supervisory role. *See id.* at 390 ("The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails."). Breiterman also violated the official media policy. *See Connick v. Myers*, 461 U.S. 138, 153 & n.14 (1983) (government's interests strengthen when an employee violates an announced official policy). Breiterman's conduct "was disruptive to the functioning" of the Capitol Police and threatened to "impair discipline or working relationships." *See Tao v. Freeh*, 27 F.3d

635, 641 n.5 (D.C. Cir. 1994). Considering all the circumstances, the Capitol Police had a strong interest in disciplining Breiterman for sharing information with the media.

Turning to Breiterman's interests, she asserts she wanted to speak on a matter of public safety and share details about the Capitol Police's failure to remedy a pattern of unattended firearms. Even considering the facts in the light most favorable to Breiterman, the record undercuts her stated rationale. For instance, Breiterman explained that she decided her leak was "a matter of public concern" only after being placed on administrative leave, "consulting legal counsel," and "think[ing] about everything." Breiterman also agreed that she "didn't want [Hess] to do anything about [the photo] but just [to] look at it." And Breiterman discovered that other firearms had been left unattended only *after* she leaked the photo. Thus, she apparently had no knowledge of any wider problem with unattended guns and no knowledge of what actions the Capitol Police had taken to remedy any previous problems. Breiterman's admissions diminish her interest in speaking on a matter of public concern.

While we recognize the public's interest in learning about a pattern of unattended firearms in the Capitol, Breiterman was not "uniquely qualified" to expose that information because she was unaware of other incidents or the response of the Capitol Police to those incidents. *See O'Donnell*, 148 F.3d at 1135; *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 572 (1968) (finding teachers uniquely situated to participate in public discussion about how school funding should be spent).

We conclude that Breiterman's interest must give way to the Capitol Police's stronger interest in efficiency, harmony,

and security. The Capitol Police disciplined Breiterman for leaking the information and photo because she violated the media policy, interfered with regular operations, damaged the trust among employees, and impaired her ability to serve effectively as a supervisor. Breiterman's interest in disclosing the information and photo so a reporter could simply "view it" is comparatively weaker, even if motivated by safety concerns. In these circumstances, "a wide degree of deference to the employer's judgment is appropriate" because "close working relationships are essential to fulfilling public responsibilities." *Connick*, 461 U.S. at 151–52. Breiterman cannot succeed on her First Amendment retaliation claim.

* * *

For the forgoing reasons, we affirm the district court's grant of summary judgment to the Capitol Police.

*So ordered.*