# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 2, 2020         Decided May 29, 2020

No. 18-5315

DEBRA STOE,
APPELLANT

v.

WILLIAM P. BARR, ATTORNEY GENERAL, U.S. DEPARTMENT
OF JUSTICE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01618)

*Susan E. Huhta* argued the cause for appellant. With her on the briefs was *Julia T. Quinn.*

*Daniel P. Schaefer*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney at the time the brief was filed, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: On August 10, 2016, Debra Stoe, Appellant, filed suit in District Court against the Attorney General of the United States in his official capacity as head of the Department of Justice ("DOJ"). Stoe's complaint alleged that DOJ had denied her a promotion to a Division Director position because of her gender, in violation of 42 U.S.C. § 2000e-16, and her age, in violation of 29 U.S.C. § 633a. On August 28, 2018, the District Court issued an order and memorandum opinion granting summary judgment in favor of DOJ. *Stoe v. Sessions*, 324 F. Supp. 3d 176 (D.D.C. 2018). Stoe filed a timely notice of appeal on October 24, 2018.

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We review the District Court's grant of summary judgment *de novo*, considering the record taken as a whole, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), viewing the evidence in the light most favorable to Stoe, and drawing all reasonable inferences in her favor, *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019). We may not make credibility determinations or weigh the evidence. *Id.*

After reviewing the record in this case pursuant to these standards, we conclude that a reasonable jury could find that DOJ's proffered nondiscriminatory reason for denying Stoe the promotion that she sought "was pretextual and that discrimination was the real reason." *Hamilton v. Geithner*, 666 F.3d 1344, 1347 (D.C. Cir. 2012). Accordingly, we reverse the grant of summary judgment against Stoe and remand the case so that it may proceed to trial.

## I. BACKGROUND

### A. Factual Background

#### 1. Stoe's Background and Experience

In 1998, Debra Stoe began working for DOJ as a GS-11 Social Science Analyst in the Office of Research and Evaluation at the National Institute of Justice ("NIJ"). Before starting at DOJ, Stoe had earned a master's degree and had worked in the private sector for twelve years as an industrial engineer. In 2004, Stoe began working as a GS-14 scientist in the Policy and Standards Division ("Division") of DOJ's Office of Science and Technology ("OST"). Her position was reclassified as "Physical Scientist" in 2010, and she held that position until 2018.

The Division is responsible for developing performance standards for law enforcement equipment and technology (*e.g.*, bulletproof body armor), overseeing conformity assessment and compliance testing programs, and developing policy for the adoption and use of law enforcement-related technology.

***Stoe's Work in the Policy and Standards Division.*** For many years, Stoe was the only program manager in the Division. She developed "new, non-traditional approaches . . . needed for the NIJ Standards and Testing Program to reach its full potential," helping to update outmoded standards. Joint Appendix ("JA") 1184. Among her many accomplishments, Stoe redesigned the system for NIJ standards development; she also oversaw the training and work product of other program managers in standards development protocols. One of the program managers who worked under Stoe's direction was Mark Greene, who was later selected for the Division Director position that Stoe was denied.

Stoe "implemented a new method for developing standards at NIJ called 'The Special Technical Committee (STC) Process.'" JA 1331. Her "outstanding leadership led to the publication of the CBRN Certification Document," which was characterized as "the gold standard" in NIJ's "new STC process." It was predicted to "impact the safety of public safety in immeasurable ways." JA 1409.

Between 2004 to 2014, Stoe's work performance record was indisputably exemplary. She published at least ten performance standards, including the first standard for chemical, biological, radiological, and nuclear protective ensembles, and a unique ballistic body armor standard, which became the most downloaded document on NIJ's website. JA 1179 ¶ 10, 1235, 1409. She also oversaw the development of at least 20 additional standards and test methods. JA 1179 ¶ 10.

According to her superiors, Stoe's sterling efforts "morphed a one[-]person standards program into a multi-person standards program and in the process morphed her roles and responsibilities from managing grants and interagency agreements to managing a program and administering the activities of others." JA 1433. Stoe's "leadership and revolutionary transformation of a moribund program . . . demonstrated capabilities that the agency never before experienced and . . . obtained previously unattainable goals and objectives." JA 1188. And her "leadership and management of NIJ's standards and testing program . . . contributed significantly to taxpayer value," saving the government "several millions [of] dollars." JA 1254. Her "radical revision" of interagency responsibilities eventually received approval from the White House's Office of Management and Budget. JA 1185, 1335-36.

Stoe also significantly revised the Division's compliance testing and conformity assessment programs to conform them to international protocols. JA 1186, 1402. She brought compliance testing in-house to DOJ, assumed responsibility for working directly with manufacturers and law enforcement stakeholders, and increased the "confidence in the manufacturing quality control process and ultimately in the safety and effectiveness of the equipment sold to [U.S.] criminal justice agencies." JA 1186. Stoe published the Division's first compliance testing administrative manual, which was adopted by other federal agencies. JA 1409.

***Stoe's Work with the Interagency Committee.*** In 2011, DOJ appointed Stoe to serve as its alternate representative on the Interagency Committee on Standards Policy ("ICSP"). The ICSP is a cabinet-level working group on standards, and it is comprised of representatives from over thirty federal agencies. Although Stoe was designated as DOJ's "alternate" ICSP representative, she was "doing the real work," JA 1370, because the primary DOJ representative did not attend meetings, JA 1380.

***Stoe's Grants Management Responsibilities***. In connection with her standards and compliance testing programs, Stoe also had substantial grants management responsibilities. By 2014, she had distributed over $30 million in federal funds to support government-funded third-party research. JA 1180 ¶ 12. The record indicates that Stoe did "an outstanding job managing grants and portfolios, consistently tracking and following" grants with "no late grant closeouts . . . or outstanding issues." JA 1235.

***Stoe's Performance Evaluations from 2010 to 2014.*** Between 2010 and 2014, Davis Hart was Stoe's first-line supervisor and George "Chris" Tillery was Stoe's second-line

supervisor. Both acknowledged that, although Stoe was in a GS-14 position, she was working at a GS-15 level. *See* JA 1191, 1179 ¶¶ 7-9, 1110. In 2010, Stoe spoke to Tillery about the discrepancy between her classification and the actual work she was doing, and he agreed that she was performing GS-15 level work. However, Stoe had to raise the issue several times with Tillery before he formally requested a desk audit for her in May 2012. Some of the GS-15 level work performed by Stoe included supervising and managing the standards testing, conformity assessment, and compliance testing programs, and representing DOJ on the ICSP.

Stoe's performance reviews, co-authored by Tillery and Hart, consistently rated her at "exceeds expectations." *See, e.g.*, JA 1191, 1382, 1392, 1401, 1408. Her personnel file is replete with glowing comments on the quality of her work and the significant impact of her efforts on public safety. *See, e.g.*, JA 1409. In 2010, Stoe received the Assistant Attorney General Employee of the Year Award, and in 2012 and 2013, she was nominated for the Samuel Heyman Service to America for Justice and Law Enforcement Award. And she was a coveted speaker at national and international conferences on standards and testing. JA 1185, 1383, 1402.

In 2013, Stoe's review stated that her "performance exceeded expectations to an exceptional degree in all elements. She consistently demonstrated unusually high initiative in performing job responsibilities and consistently performed in a manner, which is significantly beyond what is expected." JA 1383. It also noted that her performance was "made particularly exceptional by the fact that her immediate supervisor's position was vacant during much of the reporting period." JA 1383. And her superiors acknowledged that they could not "do full credit to the span of [her] work in the space available." JA 1383. At her 2014 mid-year evaluation, Stoe

asked Tillery if there was anything she could improve on, and he responded, "[N]o, you cannot improve . . . on excellence. You can't improve on somebody that exceeds at everything." JA 106.

### 2. Alleged Gender Bias Issues with Tillery

Stoe was one of two women in OST, which had approximately fourteen employees. Tillery ran OST and was Stoe's second-level supervisor beginning in 2010. Christine Crossland, who was in the Office of Research and Evaluation, a parallel division within NIJ which works closely with OST, shared office space with Stoe and routinely interacted with her. JA 1173 ¶¶ 2, 4. In her Declaration offered in the proceedings before the District Court, Crossland stated that Tillery "created and promote[d] a male-dominated workplace culture that [was] hostile to women." JA 1174 ¶ 6; *see also* JA 1181 ¶ 15. According to Crossland, Tillery treated Stoe in a "markedly worse" way than he treated male subordinates, and "this biased treatment ha[d] existed for many years." JA 1174 ¶ 7.

In her own Declaration regarding her relationship with Tillery, Stoe stated:

> Over the years, especially at meetings and presentations, Mr. Tillery has interrupted me while speaking, refused to let me finish speaking, challenged my authority and belittled me in front of male colleagues, become angry when I have corrected a mistake or incorrect statement that he made, or sometimes rephrase what I had said a moment prior, as a way of taking credit for my ideas, or suggesting that I had been inarticulate and that he needed to translate. Very often, I was and still am the only woman in the room. Furthermore, Mr. Tillery does not

> treat my male colleagues in this manner. With them he is respectful, deferential, and complimentary.

JA 1181 ¶ 16. Both Stoe and Crossland declared that Tillery's treatment of them and other women at DOJ convinced them of Tillery's "bias against women." JA 1181 ¶ 15, 1174 ¶ 6.

Crossland left no doubt that, based on what she had seen, Tillery treated Stoe differently than he treated her male colleagues:

> Frequently, I have observed Chris talk to Debra in a way that I would describe as patronizing, condescending, belittling and sexist. Even though she is one of the most outstanding performers at NIJ, Chris frequently speaks to Debra as if he thinks she does not know what she is talking about—even though she clearly does. On multiple occasions, I have heard Chris interrupt, undermine, and insult Debra in meetings in a way that I cannot imagine he would ever speak to one of her male peers. In fact, I have never observed Chris speak to a male colleague in the dismissive way he frequently speaks to Debra.

JA 1174 ¶ 8.

Although Tillery denied any gender bias, he did admit in his deposition that he had never helped promote a woman to a position above the GS-13 level. JA 1162. He claimed that there were not "a lot of women applying for positions in our office" and that "we have been under a hiring freeze anyway; so, we have had very little opportunity to hire anyone." JA 1161-62. However, the record indicates that, between 2010 and 2014, Tillery made at least six promotion decisions elevating men to GS-14 or GS-15 level positions. JA 1178 ¶ 5.

In 2010, Stoe applied to fill the vacancy in the Division Director position. She was one of two finalists. The other finalist was Hart, a male employee who was working in a GS-14 position. Tillery recommended Hart to the Acting Director of NIJ, and Hart was chosen. In his 2010 Hiring Memorandum, Tillery acknowledged that "Ms. Stoe [had] an advantage over Mr. Hart in regard to having a more detailed and in-depth understanding of a significant component of OTD's mission; specifically, with regard to managing NIJ's standards development and compliance-testing programs." JA 1422. He also acknowledged that Hart "[did] not have Ms. Stoe's depth of experience in compliance-testing and standards development," but pointed out that "Mr. Hart's experience in those areas [was] not negligible." JA 1422. Tillery gave Hart the edge because he had more supervisory and operational experience in compliance testing and standards than Stoe.

When Stoe was informed of this hiring decision, Tillery told her that the reason she was not selected was because of her lack of formal supervisory experience. JA 1178-79 ¶ 6. Tillery suggested to Stoe that it would be a good idea for her to get formal supervisory training, which she did. JA 1179 ¶ 6. By 2014, Stoe had completed 80 hours of supervisory management training.

### 3. The Events Surrounding Stoe's Non-Selection for the Division Director Position

It was well understood that, for a number of years, Stoe was successfully performing GS-15 level work even though she was employed in a GS-14 position. Between 2012 and 2014, Hart and Tillery requested "desk audits" to reclassify Stoe's position. They made these requests because they recognized that Stoe was routinely working above her grade

and performing GS-15 level work. When these requests were denied, Tillery then opted to remove GS-15 level work from Stoe's position and reassign this work to the Division Director position.

In March 2014, Hart announced his retirement. This resulted in a vacancy in the Division Director position, which was a GS-15 Supervisory Program Manager position. Tillery posted the position vacancy in April 2014.

Tillery effectively controlled the process for the selection of a new Division Director. Tillery selected two other panelists to help him review applications and interview candidates: Gordon Gillerman, an expert in conformity assessment from the National Institute of Science and Technology, and Maria Swineford, a grants management specialist who did not have a science background. There were serious discussions about removing grants management from the Division Director position, but Tillery still chose Swineford to serve on the panel. In her deposition testimony, Swineford conceded that she was "in no position to really make any sort of assessment about [the candidates'] true backgrounds" in standards and testing and conformity assessment. JA 1012-13.

In May 2014, Tillery communicated with officials in Human Resources regarding the candidates on the first certificate list that they had sent him. Tillery objected to the list because, in his view,

> [t]he applicants in the active certifications [were] a mixed bag. Many [had] no experience in conformity assessment (standards and testing). Those that [did] tend[ed] to have it in only in the area of IT. That bode[d] ill for their ability to replace [Stoe] as the Department's alternate Standard[s] Executive . . . .

JA 1458.

In June 2014, in response to Tillery, Human Resources sent another certificate list with 77 names. Stoe was ranked in 21st place on this list and Greene was ranked in 72nd place. Tillery forwarded this certificate list to Gillerman and Swineford, along with a note stating that "the individual that is selected will replace the member of our staff currently serving as one of the two alternate Standards Executives for DOJ" on the ICSP, which was Stoe. JA 1416. The panelists then divided up the 77 applications for review to determine whom they would interview.

Stoe's application was assigned to and reviewed by Swineford. After her initial review, Swineford did not recommend Stoe for an interview because she thought that Stoe lacked the requisite supervisory experience. However, Tillery "made the argument to Ms. Swineford that . . . the work that Ms. Stoe had done with coordinating the standards activities, with leading the standards activities within NIJ, and with representation on other standards bodies, in fact, justified or supported her leadership skills." JA 264. Swineford then changed her initial score for Stoe, and this resulted in Stoe being added to the interview list.

Greene was not initially selected for an interview because Gillerman concluded that Greene was unqualified "based on the assumption that the alternate standards exec role and conformity assessment . . . are critical to the job." JA 1203. Gillerman never changed his view that Greene's application did not justify an interview. JA 830. And Tillery apparently agreed with Gillerman's assessment that Greene did not meet the criteria to be interviewed. JA 1084. As it turned out, the only reason Greene was interviewed was because of "a policy

that if one Office of Justice Programs employee on a certificate was interviewed (in this case, Stoe), then all employees on that certificate who work in the same component must also be interviewed." Br. for Appellee at 10.

"In 2014, Greene had worked for the Division for only four years, less than two of them as a GS-14. Greene's first exposure to standards and conformity assessment at DOJ came from assignments Stoe was 'managing.' His relatively limited portfolio of standards and grants management work was on projects that had been shifted to him from Stoe. By 2014, Greene had not published a single standard, had never performed GS-15 level work, and he lacked supervisory experience and supervisory training." Br. for Appellant at 16-17 (footnote and citations omitted). Greene had a Ph.D. in Materials Science and Engineering, completed a postdoctoral fellowship at the National Institute of Science and Technology, and had worked in the private sector. However, Greene had never performed GS-15 level work as Stoe had done. Greene was 38 years old and Stoe was 60 years old at the time of the 2014 selection.

On or about June 20, 2014, the panelists deliberated and Tillery then decided whom to interview. Seven candidates were interviewed. In preparation for the interviews, Tillery wrote five questions that the panelists should raise with each candidate.

As Appellant explains, "[t]he first question related to the 'ability to analyze organizational and operational problems and develop solutions' and specifically referenced service on the ICSP and asked the candidates to 'describe a situation in which you identified a problem related to conformity assessment activities. . . .' The second question related to 'knowledge of program management principles,' referenced technology

policy, and asked for a situation in which the candidate 'provided program management advice or assistance. . . .' The third related to the 'ability to provide advice and guidance on business and program management issues' and asked the candidates to 'describe a situation in which you provided advice or guidance' related to 'grants and/or contract management.' The last two questions related to supervisory/ leadership abilities and asked the candidates to 'describe situation[s]' in which they 'performed a leadership role' and 'dealt with a variety of stakeholders.'" Br. for Appellant at 17 n.13; *see also* JA 1445-52. (The interview questions appear in the APPENDIX.)

Tillery determined that each question was to be weighted equally: each panelist was to grade each interviewee on each question, using a scale of 1 to 5, with 5 being the highest score possible. Only the first question focused on conformity assessment and the ability to serve as DOJ's representative on the ICSP. None of the questions asked about standards development or about overall experience.

The interviews took place on July 11 to 16, 2014, with thirty minutes allotted for each interview. Gillerman and Swineford followed a pattern of taking notes on each of the candidates' responses to each question. Tillery, however, did not take notes on Greene's answers to four of the five questions. For each candidate, Tillery wrote *initial scoring ranges* for each question and then picked one score at some point after the interviews. For example, Tillery gave Greene an initial score of "3-5" on every question. After the interviews were over, however, he changed Greene's scores to either "4" or "5" for each question (even though he had no notes for Greene on four of the five questions). Tillery's initial scoring ranges for Stoe were "2-3" and "4-5"; however, in his final assessments, he changed Stoe's scores to the low end of the

range for three of her five responses. Tillery had notes for all Stoe's answers.

A graphic example of Tillery's scoring is seen in connection with his assessments of the answers given by Stoe and Greene to the third question on grants management. Tillery initially gave Stoe a score of "2-3" on the grants management question, while giving Greene a score of "3-5" for the same question. JA 550, 559. Although Tillery did not have any notes on Greene's answer, he later went back and assigned Greene a 5, while dropping Stoe's score to 2.

*Stoe's Interview.* Stoe's interview lasted less than thirty minutes, apparently because Swineford showed up late. And Stoe was not asked any follow-up questions. On Stoe's response to her first question, Gillerman and Swineford both graded Stoe a 5. In his initial scores, Tillery gave Stoe a "4-5" on this question, but then downgraded it to a 4 in his final scoring. When asked at his deposition about Stoe's score, Tillery could not recall why it had been lowered and his notes do not reveal anything negative. JA 1127-28, 548.

Tillery was critical of Stoe's response to the second question because it was focused on her area of expertise. Although he testified that there had been "[a]bsolutely nothing wrong with [her response]," he gave her a score of 3. JA 1130. Swineford and Gillerman each graded Stoe a 4. At one point during Stoe's interview, Tillery shook his head to express a negative reaction to one of her responses. Stoe felt that Tillery was "attempt[ing] to influence the other two panelists to maybe grade [her] down or downgrade [her] a little bit on that particular question." JA 966.

Swineford felt that, in her response to the third question, Stoe showed that she had "good experience" in grants

management. Swineford was "impressed" with Stoe's answer and gave her a score of 4. JA 1000, 1597. Gillerman gave Stoe a 3, while Tillery gave her a final score of 2. For the final two questions, Stoe received scores of 4, 3, and 3 on one, and 5, 5, and 4 on the other. *See* JA 634.

***Greene's Interview.*** Greene's interview lasted approximately 45 minutes, with follow-up questions. With respect to the first question, Gillerman believed Greene's "discussion was not focused on the issues of standards executives or the policy associated with standards executive work." JA 849. Tillery also found that Greene "did not have a specific understanding of the role of the standards executive within the federal government" and wrote in his notes that Greene did a "little tap dance around [the] standards executive's role." JA 1123-24. Gillerman and Tillery still gave Greene a 4 on this answer, and Swineford gave him a 5.

Greene's answer to the second question focused on his experience moderating a talk on smart gun technology, during which he walked "around the room with a microphone like Phil Donahue" and made sure to keep them from having a discussion on gun control policy. JA 910-11. Tillery testified that Greene's response "involved a more complex issue or set of issues than Ms. Stoe's response." JA 276. Yet, Tillery had found Stoe's response to be too focused on her area of expertise when she discussed her standards program during this question. Tillery and Gillerman gave Greene's response a score of 4, and Swineford gave him a 5 on this question.

Regarding Greene's response to the third question, dealing with grants, Swineford noted that Greene "described extensive experience with not only grants but with interagency agreements," but she could not remember during her deposition whether Greene had discussed all aspects of the grants process.

16

JA 1031-33. Swineford gave Greene's response a 4, and Tillery and Gillerman both gave Greene a 5.

Gillerman's notes appear to question Greene's response to the fourth question: "What was accomplished[?] What did he do? Leadership?" JA 587. Gillerman gave Greene's answer a 3, while the other panelists graded it a 4. For the fifth question, Greene again relied on his moderator example, and was given a 4 by Tillery and Gillerman and a 5 by Swineford.

*Higgins' Interview.* Gillerman and Swineford both thought Kathleen Higgins, the third finalist, was unprepared and ranked her the lowest on their combined scores. Tillery was "very disappointed" with Higgins' interview, saying that "she struggled most with the two leadership questions" and that "she could have done much, much better." JA 1093-94. According to Tillery, Higgins "had a wealth of experience, and . . . it did not come across as well as it should." JA 1093. Nevertheless, Tillery gave Higgins a 5 on the first question and a 5 on both questions dealing with supervisory responsibility. When asked who Tillery believed did better between Stoe and Higgins during the interview, Tillery answered that Stoe did, but later tried to qualify his answer. JA 1105-06.

On the final day of interviews, even though he had not discussed the deliberation process with the other two panelists or seen their actual scores, Tillery contacted his supervisor to tell him that the panel was choosing between Greene and Higgins. Then on July 18, Tillery sent an email to Gillerman and Swineford giving them his preliminary scores. No discussion between the panelists preceded Tillery's email. Gillerman and Swineford did not share their preliminary scores until July 21. In his email to Gillerman and Swineford, Tillery proposed that the panel "sum [their] final totals for each candidate and divide by 3 to come to a final score." JA 626.

Tillery's final scores had Greene and Higgins tied for first place with 21 points, and Stoe in third place with 18 points. Gillerman had Greene and Stoe tied for first place with 20 points, and Higgins in third place with 17 points. Swineford had Greene in first place with 23 points, Stoe in second place with 19 points, and Higgins in third place with 18 points. Swineford scored Greene higher than Stoe on all questions except for the question on grants, on which she gave them both a 4. However, at her deposition, Swineford mentioned grants management as the only area in which Greene was the stronger candidate. JA 1046-47.

On July 21, the panelists deliberated by telephone. Swineford did not remember anyone advocating for or even mentioning Higgins in deliberations. JA 1018-19. Rather, she stated that "it was primarily a conversation between recommending Debra or Mark." JA 993.

In his 2014 Hiring Memorandum, Tillery wrote that "it was the consensus of the panel that Dr. Greene was best qualified to fill this position." JA 387. However, in his deposition, Gillerman said that he did not recall any such deliberations, and he said he could not recall coming to a consensus on the final selection. JA 868-70, 873-74. Gillerman made it clear that he "was not the selecting official," which he clarified to mean that he "was not the final decision maker" in selecting Greene. JA 873. Tillery assumed that role.

On July 21, 2014, after the panel had conferred by telephone, Tillery emailed his supervisor to inform him of Greene's selection. He said that: "The major differentiators in Mark's favor were his detailed understanding of the . . . grants processes and their issues and his ability to provide guidance on technology policy." JA 1436. Yet, Tillery had praised Stoe

for doing "an outstanding job managing grants," testified that Stoe had more experience in grants management and business processes than Greene, and never indicated in Stoe's performance reviews that her grants management work was substandard in any way. JA 1235, 1140.

At one point in his deposition, Tillery stated that he scored the candidates based solely on how they responded to the interview questions. JA 1120-21. This is perplexing because Tillery used a range of scores ("3-5") in his initial assessments of Greene on every question; he had no notes on Greene for four of the five questions; and then, after the interviews, he gave Greene final scores of 4 or 5 on every question. After selecting Greene for the position, Tillery wrote to an official in Human Resources to say that: "I am well aware of [Greene's] skills and capabilities having worked closely with him on numerous projects over the years. Contacting references is not necessary in this case." JA 1435.

Tillery later informed Stoe that, although she had not been selected for the position, she had "scored better than the other candidates on four out of five interview questions, and second highest on the question dealing with grants management." JA 1180 ¶ 13. This was not true. *See* JA 634. When Stoe asked him to clarify why she had not received the position, Tillery explained that "a candidate would not be selected if they had scored lower than a '3' on any of the interview questions, implying that this would be justification for denying a candidate the position." JA 1180 ¶ 13. However, there is nothing in the record to confirm this. And there is nothing to indicate that Gillerman or Swineford operated on this assumption.

Tillery testified that he ultimately selected Greene due to "Dr. Greene having a greater appreciation for the issues of

technology policy and [his] understanding that Dr. Greene had a more nuanced application of conformity assessment than Ms. Stoe." JA 1101. "This was the only time conformity assessment was cited as a reason for Greene's selection. It squarely conflicts with the panelists' scoring, as no one scored Stoe lower than Greene on the first question about conformity assessment." Br. for Appellant at 25. And Tillery could not recall any specifics regarding Greene's discussion of conformity assessment. Yet, Tillery explained that while Stoe had more experience with conformity assessment and understood the process better, Greene had a better "understanding of potential." JA 1102-03.

Following her non-selection, most of the work that Stoe had been doing was reassigned to Greene. As the Division Director, Greene was assigned to run the standards program, serve on the ICSP, work on body armor projects, and oversee conformity assessment duties. All of these duties were formerly performed by Stoe, who consistently received high praise for her work in the Division. In addition, Greene's new position was stripped of all grants management responsibilities, just as had been suggested at the start of the process to fill the vacancy in the Division Director position.

## B. Procedural History

On August 10, 2016, Stoe filed a complaint in District Court, alleging that DOJ denied her a promotion because of her gender, in violation of 42 U.S.C. § 2000e-16, and her age, in violation of 29 U.S.C. § 633a. On August 28, 2018, the District Court entered a final order granting DOJ's motion for summary judgment. On October 24, 2018, Stoe filed a timely notice of appeal.

## II.   ANALYSIS

### A.   Standard of Review

"This court reviews the District Court's ruling on summary judgment *de novo*." *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1193 (D.C. Cir. 2018). This means that we must review the record "taken as a whole." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And in conducting this review, we are required to "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks and citation omitted). We must then determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under this standard, "[t]he evidence of the non-movant is to be believed." *Id.* at 255.

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that, first, 'there is no genuine issue as to any material fact' and, second, 'the moving party is entitled to a judgment as a matter of law.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting FED. R. CIV. P. 56(c)). In other words, if there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, judges must ask themselves not whether they think "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. That is, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. And in viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in her favor, the court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. In short, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are not the functions of the court. *Id*. at 255. These are matters for a jury if the court determines that there is a genuine issue for trial.

## B.   The Applicable Legal Standards

Stoe's causes of action in this case arise under 42 U.S.C § 2000e-16 and 29 U.S.C. § 633a. Both provisions cover employment in the federal government. Section 2000e-16(a) states that "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on . . . sex." 42 U.S.C. § 2000e-16(a). Section 633a(a) states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a).

Regarding claims arising under § 2000e-16(a), we have explained the burden-shifting requirements, as follows:

> [When] the record contains no direct evidence that the adverse employment action of which the plaintiff

complains was caused by prohibited discrimination, we turn to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), to analyze the claim. Under this framework, the plaintiff must first establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants.

. . . .

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to produce evidence that the plaintiff was rejected for a legitimate, nondiscriminatory reason. . . .

. . . .

. . . If the defendant produces such evidence [of a nondiscriminatory reason], the *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and the sole remaining issue is discrimination *vel non*. At this point, to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason. By "all of the evidence," we mean any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on

the part of the employer. *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc).

*Holcomb*, 433 F.3d at 895-97 (internal quotation marks and citations omitted).

With respect to claims of age discrimination arising under § 633a(a), we have explained that "plaintiffs can establish liability . . . in one of two ways. First, they can make use of the *McDonnell Douglas* evidentiary framework to establish that age was the but-for cause of the challenged personnel action. . . . Second, plaintiffs may establish liability by showing that age was *a* factor in the challenged personnel action." *Ford v. Mabus*, 629 F.3d 198, 207 (D.C. Cir. 2010); *see also Reeves*, 530 U.S. at 142 (applying the *McDonnell Douglas* framework to a claim arising under the Age Discrimination in Employment Act).

There is no dispute here that Stoe meets all of the criteria necessary to establish a prima facie case under § 2000e-16(a) and § 633a(a): (1) she is a woman over the age of forty; (2) she was qualified and applied for the Division Director position; (3) she was rejected; and (4) the position went to Greene. It is also undisputed that DOJ produced evidence that Stoe was denied promotion for a facially legitimate, nondiscriminatory reason. *See Reeves*, 530 U.S. at 142. DOJ claims that the selection decision was based on the candidates' interview performance, and Greene was selected because, according to DOJ, his "answers better demonstrated his relevant experience and narrowly superior qualifications across the board than did Stoe's." Br. for Appellee at 21.

Thus, a "central inquiry" here is whether Stoe produced sufficient evidence for a reasonable jury to find that DOJ's "asserted non-discriminatory reason was not the actual reason

and that the employer intentionally discriminated against [her] on a prohibited basis." *Hamilton*, 666 F.3d at 1351 (internal quotation marks and citation omitted). "Because in appropriate cases a 'factfinder's disbelief of the reasons put forward by the defendant' may support an inference of intentional discrimination, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993), we do not routinely require plaintiffs 'to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.' *Aka*, 156 F.3d at 1290." *Id.*

With these standards in mind, and viewing the evidence in the light most favorable to Stoe and drawing all reasonable inferences in her favor, "taking care neither to make credibility determinations nor to weigh the evidence before us," *id.*, we conclude that "a fair-minded jury could return a verdict for [Stoe] on the evidence presented." *Anderson*, 477 U.S. at 252. The parties do not analyze the evidence separately in relation to Stoe's age and sex discrimination claims, instead treating the claims as rising or falling together on the presence or not of material factual disputes over whether the employer's reasons were pretextual. See Br. for Appellant at 1; Br. for Appellee at 2. We do the same.

## C. The Candidates' Relative Qualifications

Stoe points out that, "[t]ellingly, DOJ never contends that Greene was the best qualified for the job, and all but concedes that a jury could find Stoe better qualified than Greene. *See* DOJ Br. at 3[5]-[38] (Stoe 'had more experience in standards and conformity assessment,' 'more relevant experience' at OST 'developing and publishing standards,' and 'was in some ways more qualified on paper than was Greene')." Reply Br. for Appellant at 8 n.4. Appellant's Reply Brief amplifies these points. We quote at length, both because the material is fully

supported by the record and the differences between Stoe's and Greene's qualifications are aptly highlighted:

[Stoe] had been successfully performing a *majority* of the Division Director responsibilities for many years, while Greene had no comparable background. This evidence alone would allow a reasonable juror to conclude that Stoe was substantially better qualified. DOJ's brief completely ignores this record evidence – a damning omission.

DOJ also ignores the uniquely relevant and superlative quality of Stoe's "revolutionary work," which allowed her to achieve "previously unattainable goals and objectives." Indeed, Stoe spent ten years *creating* the Office of Science and Technology's ("OST") standards development and conformity assessment programs, whereas Greene had only worked on "discrete parts" of the standards development and conformity assessment programs, for eighteen months *under Stoe's direction*. Simply put, Stoe was an undisputed expert in the core areas of responsibility for the position, and Greene was not. While DOJ stresses that Greene worked on "technology performance and equipment performance standards," it cannot dispute that he had never published a single standard, whereas Stoe had personally published ten standards and oversaw the development of at least twenty more. Likewise, Stoe was the only candidate with experience serving on the Interagency Committee on Standards Policy ("ICSP"), one of the key Division Director responsibilities. Greene had no ICSP experience (which led the panel to initially deem him unqualified), and he was only granted an interview

due to a DOJ policy whereby Greene had to be interviewed because Stoe received one.

As for government experience, Stoe had twelve more years of experience working for DOJ than Greene. She had eight more years of GS-14 experience than Greene and had worked at the GS-15 level for at least four years, whereas Greene had no GS-15 experience. . . .

. . . DOJ suggests Greene's experience in the private sector, his fellowship experience at National Institute of Science and Technology ("NIST"), and his PhD, rendered the gap between his and Stoe's credentials insubstantial. But DOJ ignores evidence that before joining DOJ, Stoe had twelve years of relevant private sector experience, whereas Greene had at most five. DOJ also fails to explain how Greene's NIST fellowship meaningfully enhanced his qualification for a supervisory position in OST, and overlooks Stoe's experience working with NIST for many years. DOJ's suggestion that Stoe did not have substantially better supervisory and leadership qualifications [DOJ Br. at [37-38]] ignores the fact that Stoe for years had (informally) supervised the work of multiple GS-13 and GS-14 program managers, *including Greene himself*. DOJ tries to downplay Stoe's 80 hours of supervisory training, but that was 80 more hours than Greene had when he was selected to lead the division. . . .

Next, DOJ claims Greene had a "good deal" of experience with grants and other "business-related aspects" of the position, but ignores evidence that Stoe had done an "outstanding job" managing grants

for many years. Even Tillery admitted that Stoe had greater experience managing grants than Greene. Moreover, DOJ completely ignores evidence that Tillery knew at the time of the selection decision that the Division Director role was about to be divested of grants management responsibilities and was, in fact, divested of those responsibilities within a year of Greene's selection.

Reply Br. for Appellant at 2-5 (footnote and citations omitted). Even the District Court recognized these marked differences in the qualifications of Stoe and Greene. *Stoe*, 324 F. Supp. 3d at 187-88.

Unsurprisingly, Stoe argues that she should prevail in this matter because, based on the evidence in the record, a reasonable jury could find that she was *substantially better qualified* for the Division Director position than was Greene. The Supreme Court has held that "qualifications evidence may suffice, at least in some circumstances," to demonstrate that an employer's proffered explanation is pretext for discrimination. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). Following *Ash*, this court developed a framework for evaluating claims "involving a comparison of the plaintiff's qualifications and those of the successful candidate." *Hamilton*, 666 F.3d at 1352 (internal quotation marks omitted) (quoting *Aka* v. *Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)). In *Aka*, we noted that:

> If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do

not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

156 F.3d at 1294. However, we have been cautious in explaining the inferences to be drawn from comparative qualifications evidence:

"[W]e must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone." For this reason, a disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is "great enough to be inherently indicative of discrimination"—that is, when the plaintiff is "markedly more qualified," "substantially more qualified," or "significantly better qualified" than the successful candidate.

*Hamilton*, 666 F.3d at 1352 (citations omitted) (first quoting *Aka*, 156 F.3d at 1294; then quoting *Holcomb*, 433 F.3d at 897).

Although the record in this case surely supports Stoe's claim that she was better qualified than Greene, we need not decide whether a jury would find that she was 'significantly' or 'markedly' more qualified. *Holcomb*, 433 F.3d at 897; *see also Hamilton*, 666 F.3d at 1352 ("Given the record in this case . . . [this] is a question we need not conclusively resolve."). As we noted in *Hamilton*,

[P]laintiffs are "expressly *not* limited to comparing [their] qualifications against those of the successful

applicant; [they] may seek to expose other flaws in the employer's explanation." *Holcomb*, 433 F.3d at 897; *see also Ash*, 546 U.S. at 458 (noting approvingly the Eleventh Circuit's suggestion that "superior qualifications may be probative of pretext when combined with other evidence"). Here, [Stoe] relies not only on comparative qualifications evidence, but also "seek[s] to expose," *Holcomb*, 433 F.3d at 897, procedural irregularities in a highly subjective selection process. Reviewing the record as a whole, we agree that the evidence of [Stoe's] superior qualifications taken together with "other flaws in the employer's explanation," *id.*, creates a genuine issue of material fact that only a jury can resolve.

666 F.3d at 1352.

In an attempt to counter the foregoing case authorities, DOJ relies heavily on *Fischbach v. District of Columbia Department of Corrections*, 86 F.3d 1180 (D.C. Cir. 1996). The court in that case held that "Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates." *Id.* at 1183. Suffice it to say that this case involves very different issues, regarding whether superior qualifications may be probative of pretext, procedural irregularities in the selection process, false testimony, and accumulated evidence of gender bias against the claimant. As we have explained, the decisions in *Reeves*, *Iyoha*, *Hamilton*, *Holcomb*, *Aka*, and *Ash*, not *Fischbach*, control the disposition of this case.

**D.    A Reasonable Jury Could Find in Stoe's Favor Based on Her Superior Qualifications, the Accumulated Evidence of Gender Discrimination, and Pretext**

As shown above, Stoe offered compelling evidence to prove that Tillery had: (1) discriminated against Stoe on the basis of her gender in the past; (2) ruled Stoe out of consideration for the promotion even before she was interviewed; (3) designed the interview questions and process to mask Stoe's superior qualifications; (4) allowed gender bias to taint his scoring of the candidates in their interviews; (5) influenced the other panelists' scoring to the detriment of Stoe; (6) infected the selection process with his bias by sending out his votes to the panel in advance of their final deliberations; (7) in effect reported to his superior that Greene had been selected before deliberating with other members of the panel; and (8) provided shifting and false rationales for his inconsistent actions. According to Stoe, viewing this evidence in the light most favorable to her, and drawing all reasonable inferences in her favor, a reasonable jury could find that DOJ's proffered nondiscriminatory reason for denying her the promotion that she sought was pretextual and that discrimination was the real reason. We agree.

First, Stoe provided testimony that Tillery discriminated against her on the basis of gender prior to the contested promotion action at issue in this case. It is undisputed that evidence of discriminatory statements or attitudes by a decision-maker may support a finding of discrimination, even if the disparaging comments were not made in the context of the contested employment action. *See, e.g.*, *Reeves*, 530 U.S. at 152. A reasonable jury could conclude that Stoe's evidence of Tillery's treatment of her and other female colleagues revealed his "bias against women." *See* JA 1181 ¶ 15. For example, Tillery took credit for Stoe's ideas, challenged her authority,

belittled her in front of male colleagues, interrupted her while she was speaking, and became angry if she corrected him. JA 1181 ¶ 16. Further, in her Declaration, Stoe's colleague, Crossland corroborated this view of Tillery's sexist treatment against women. JA 1173-76. Crossland described Tillery's treatment of Stoe as "patronizing, condescending, belittling and sexist." JA 1174 ¶ 8. As even the District Court acknowledged, Stoe's evidence of Tillery's treatment of her and other female colleagues revealed a "pernicious" form of "sexism." *Stoe*, 324 F. Supp. 3d at 197. A jury might find this to be compelling evidence of discriminatory motive, which caused Tillery to act against Stoe because of her gender.

Second, Stoe provided testimony that Tillery ruled her out of consideration even before she was interviewed. For example, Tillery expressed a desire to replace Stoe on the ICSP, even though serving on the ICSP would be one the main responsibilities of the Division Director position. In an email to Human Resources, Tillery communicated that he was not satisfied with the list of candidates "to replace Debra." JA 1458-59. And later when he forwarded a revised list of candidates to his fellow panel members, he stated that the selectee would "replace" Stoe on the ICSP. JA 1416. He knew at the time that Stoe was applying for the Division Director position. A reasonable jury certainly might view Tillery's emails as further evidence of discriminatory motive showing that Tillery meant to prevent Stoe from being promoted because of her gender.

Third, Stoe provided evidence that Tillery designed the interview process to mask her superior qualifications and to manipulate the scoring of candidates. A reasonable jury could easily see this as evidence of pretext. Tillery made the decision to base the selection entirely on the interviews. Tillery also wrote and weighted the questions himself. And Tillery adopted

a scoring system that was easily manipulated. The measure of interview performance is hardly an exact science. Different interviewers may hear the same thing from the same candidate and grade it very differently. The evidence in this case proves the point. This is why, "although employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution." *Aka*, 156 F.3d at 1298. It is well understood that assessments of interview performances and dubious scoring systems can be used to cover up discriminatory hiring practices. *See, e.g.*, *Hamilton*, 666 F.3d at 1355-56.

In *Hamilton*, the interview panelists did not create a written record of their deliberations or reasons for choosing the final selectee, leaving the court with no evidence of the decision-making process. *Id.* The situation in this case is worse because of "[t]he irregularities of Tillery's scoring methodology, including initially assigning a score range during the interviews (thereby reserving his ability to settle on final scores to fit his desired outcome), and then later assigning Greene scores at the high end of the range and Stoe the low end, then further lowering one of Stoe's scores again without explanation." Reply Br. for Appellant at 17-18. For example, Tillery lowered his scoring of Stoe's response to the first question but could not recall why during his deposition, nor did his notes reveal anything negative. JA 1127-28, 548. Another example is Stoe's response to the second question: Tillery had given Stoe a 3 for her response (not a very strong score), but during his deposition he said that there was nothing wrong in the way she had responded. JA 1128-30. The record reveals that during the interviews Tillery assigned Stoe and Greene a *range of scores* for each question; he then subsequently went back and assigned concrete scores at some point after the interviews. JA 545-53, 555-62. A reasonable

jury could infer that Tillery delayed assigning concrete scores to Stoe's and Greene's interview answers so that he could manipulate the scores. And a reasonable jury could conclude that the resulting scores were merely pretextual and gender bias was the real reason behind Tillery's scores.

A most telling example is seen in Tillery's initially giving Stoe a raw score of "2-3" on the grants management question, while giving Greene a raw score of "3-5" for the same question. JA 550, 559. Although Tillery had no notes on Greene's answer, he later went back and assigned Greene a 5, while assigning Stoe a score of 2. In the scoring format adopted by Tillery, this three-point differential between Stoe's and Greene's scores had a huge impact on the final result.

It is also noteworthy that, on July 16, 2019, immediately after the interviews concluded and before the panelists' scores had been tabulated, Tillery sent a message to his superior proclaiming that "[i]ts between Mark Greene and Kathy Higgins." JA 1442. A reasonable jury might conclude that Tillery meant to lock in a result favoring Greene before the panel had deliberated and reached consensus.

Tillery's interview questions also suggest an attempt to distract from Stoe's superior qualifications. Only one of the five interview questions Tillery wrote focused on a major responsibility of the Division Director position – the standards and conformity assessment programs and ICSP representation – which Stoe had already been performing for years. Although this was the most relevant question for the position (Stoe was ranked the highest on this question), Tillery weighed it equally to the other four questions. Moreover, Tillery did not ask any questions regarding experience relevant to the position. This is critical, because Stoe had been performing many of the responsibilities of the Division Director position already. In

*Salazar v. Washington Metropolitan Area Transit Authority*, 401 F.3d 504 (D.C. Cir. 2005), the court found that a reasonable jury could infer that the interview panelists "selected an interview agenda which, though facially acceptable, was designed to downplay [the plaintiff's] strengths." *Id*. at 510. Use of the interview process to minimize a candidate's strengths, as a reasonable jury might conclude occurred in this case, can be taken as pretextual to cover proscribed discrimination against the candidate. *See id.* at 509-10.

Fourth, Stoe provided further evidence that the selection process created and run by Tillery was anything but fair and, in fact, likely a pretext to cover his gender bias. For example, Tillery sent his votes to the panel in advance of their deliberations. A reasonable jury might view this as an attempt to influence the panel. Tillery was the lead official throughout the selection process, which obviously carried significant weight. He wrote the questions, determined how the candidates would be scored, sent his scores to the other panelists before their deliberations, and notified his superior of a decision that had yet to be reached. Tillery claimed that the panel reached "consensus" on the selection of Greene. However, Gillerman said he recalled no consensus ever being reached. Tillery was also the only person on the panel who knew the three finalists, and he had a history of gender bias against Stoe (which the other panelists may not have known about). Tillery was the only one on the panel who could claim close familiarity with the Division Director position, which of course would carry weight in panel interactions. Indeed, Swineford candidly acknowledged that she had doubts about her ability to judge the candidates fairly. In this context, a reasonable jury could find Tillery was in a good position to influence the scoring of the other two panelists and that he did, in fact, employ the process that he had created as pretext for

unlawful discrimination. The law is clear that an unfair selection process is no defense to a claim of discrimination.

The decision in *Iyoha*, citing *Salazar*, 401 F.3d at 509, pointedly states that "when an employer seeks to rely on a 'fairly administered' process to justify an employment action, the process must in fact be fair." 927 F.3d at 570. The court in *Iyoha* further explains that "[a] selection process that relies on numerical scores given by a panel of interviewers is only as fair as the panelists who give the scores." *Id.* In *Iyoha*, the court found that a reasonable jury could find that because the senior member of the panel had past acts of discrimination toward the plaintiff and was in a position to potentially influence the scores given by the other panelists, the plaintiff was not provided "a fairly administered selection process, and that [the defendant's] claim to the contrary is pretextual." *Id.* (internal quotation marks and citation omitted). We understand that, in this case, the District Court did not have the benefit of the *Iyoha* decision, issued in 2019, when it decided the Attorney General's summary judgment motion in August 2018.

Fifth, Stoe presented evidence that Tillery provided shifting and false rationales for the selection of Greene. For example, Tillery told Stoe that she was not selected because candidates had to score at least a 3 on every question to be the final selectee. However, nothing in the record supports this, and there is nothing to indicate that the other two panelists operated on this assumption. Furthermore, the record indicates that Tillery told his supervisor that Greene was selected because he performed better than Stoe on grants management and technology policy. JA 1436. And the record additionally indicates that Tillery testified that Greene was selected due, in part, to his more "nuanced" appreciation of conformity assessment. JA 1101. This last claim not only differs from the prior two explanations, but it cannot be squared with the

panelists' scoring of the candidates on the conformity assessment question. No panelist scored Greene higher than Stoe on Question 1.

A factfinder "can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves*, 530 U.S. at 147 (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)). A reasonable jury could view Tillery's shifting explanations of the selection decision as evidence of pretext to cover up his gender bias.

One final point regarding Tillery's alleged manipulation of the selection process is worth mentioning. It concerns Tillery's assessments of Higgins during the interview process. Appellant convincingly explains why Higgins' inclusion as a finalist in the selection process neither negates the other inferences of discrimination that are apparent in this case, nor diminishes the evidence suggesting that Tillery manipulated the selection process and used it as a pretext to discriminate against Stoe. Here is what Appellant says:

> Tillery's top-place scoring of Higgins was suspicious given his subsequent testimony that he found that her interview performance was "very disappoint[ing]," her relevant experience "did not come across as well as it could," and she "struggled with the leadership questions." [JA 1093-94]. This testimony is almost impossible to square with Tillery's perfect scores for Higgins on the conformity assessment/ICSP-related question and both questions on supervisory abilities. [JA 634]. When asked to

explain the apparent inconsistency, Tillery inexplicably responded that Higgins provided "better examples" with better "substance" than Stoe, but Stoe "did a better presentation job than Ms. Higgins." [JA 1106-07]. *Cf. Figueroa* [*v. Pompeo*], 923 F.3d [1078, 1094 (D.C. Cir. 2019)] ("evaluators essentially are grading candidates on absolute terms and against one another along a curve, and they therefore should be able to explain why one candidate's grade is lower than others."). Tillery's testimony, combined with Swineford's recollection that he never even mentioned Higgins in post-interview deliberations, [*see* JA 1018-19], suggests Tillery's first-place scoring of Higgins was intended to mask his gender bias against Stoe. Were that his plan, it was successful vis-à-vis the District Court, which found Tillery's "high score for Higgins [tended] to negate Stoe's assertion that Tillery discriminated against her." [*Stoe*, 324 F. Supp. 3d at 199]. But a reasonable juror could infer that Tillery's scoring was a sham, and Stoe outperformed both Higgins and Greene.

Br. for Appellant at 42 n.22. We agree with Appellant that "[s]ubstantial evidence exists for a reasonable juror to find Tillery did not score the candidates based on an honest assessment of their interview performance, and his scoring was biased against Stoe." *Id*. at 42.

DOJ contends that Tillery's support for Higgins, including his equal scoring of Higgins and Greene, "negates any weak inference that Tillery discriminated against Stoe." Br. for Appellee at 18. We strongly disagree. It is true that when a plaintiff claims discrimination after being denied a position, if the position was filled by another person who is within the same protected class as the plaintiff, this normally

"cuts strongly against any inference of discrimination." *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005). *But see Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002) (holding that "a plaintiff in a discrimination case need not demonstrate that she [lost out on a promotion to] a person outside her protected class in order to carry her burden of establishing a prima facie case"). However, the "same protected class" caveat cited in *Murray* has no application in this case because neither Stoe nor Higgins was hired to fill the Division Director position.

\* \* \* \*

Given the caliber and quantity of the evidence offered by Stoe in opposition to the motion for summary judgment, we have no doubt that a reasonable jury could find that DOJ's proffered nondiscriminatory reason for denying Stoe the promotion that she sought was pretextual and that discrimination was the real reason. The matters at issue in this case must be decided by a jury.

### III.    CONCLUSION

We reverse the grant of summary judgment in favor of DOJ and remand the case to the District Court so that it may proceed to trial on Stoe's claims of gender and age discrimination.

**APPENDIX**

Interview Questions

(1) One of the major duty assignments associated with this position is to provide program advice and guidance. As noted in the vacancy announcement, if you are selected you will serve as one of the two alternate standards executives for the Department of Justice. In that regard, describe a situation in which you identified a problem related to conformity assessment activities, and evaluated the alternatives to make a recommendation or decision. What was the problem and who was affected? How did you generate and evaluate your alternatives? What was the outcome?

(2) Another of the major duty assignments associated with this position is program planning and management. As noted in the vacancy announcement, if you are selected for this position you will be expected to oversee NIJ's efforts to coordinate federal policy as it relates to technology applied to criminal justice purposes. Please describe situations in which you provided program management advice and assistance related to technology policy. As it relates to the above, describe a situation in which you applied analytical and evaluative methods and techniques related to program policies and activities as they relate to major agency programs. What were the methods and/or techniques you used? Who was affected by your decision? What was the outcome of your decision?

(3) Another of the major duty assignments associated with this position is program planning and management. As noted in the vacancy announcement, if you are selected for this position you will be expected to oversee OST's business processes as they relate to NIJ's science and technology

programs. Describe a situation in which you advised or consulted on program management matters, finance issues, or data, as they related to grants and/or contract management, and/or management of agreements; particularly wih [sic] for-profit entities. What was the problem and who was affected? How did you generate and evaluate the alternatives to make a recommendation? What was the outcome?

(4) The fourth major duty assignment associated with this position is supervisory and/or management responsibilities. Please describe a situation in which you performed a leadership role and/or motivated others toward the accomplishment of a goal. What was involved, what did you do, and what was the outcome?

(5) Describe a situation in which you dealt with a variety of stakeholders. Who was involved, what was the issue or objective, and what was the outcome[?] How did you interact with the group[?]